**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

DAVID KELLY, RICHARD NORKO,          :          Civil Case Number
ANNETTE DOBBS, PETER DELLOLIO,       :
    *Plaintiffs,*                  :          3:16-cv-00543 (VLB)
                                  :
    v.                           :          February 8, 2017
                                  :
HONEYWELL INTERNATIONAL, INC.        :
    *Defendant.*                  :


## MEMORANDUM OF DECISION ON THE PARTIES' CROSS-MOTIONS FOR SUMMARY JUDGMENT [DKTS. 44, 45]


### I.   INTRODUCTION

This case is about the decision of Defendant Honeywell International, Inc. ("Honeywell") to terminate Plaintiffs retirees' full medical coverage benefits. Plaintiffs David Kelly, Richard Norko, Annette Dobbs, and Peter Dellolio (collectively, "Plaintiffs") are retired union workers and a surviving spouse who allege that the termination of such benefits constitutes an anticipatory breach of the collective-bargaining agreement; a violation of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1002(1), 1132; and a breach of Honeywell's fiduciary duty under ERISA, 29 U.S.C. § 1104(a). [Dkt. 1 (Pls.' Complaint)]. Before the Court are cross-motions for summary judgment. At issue is whether and under what circumstances the provisions of the CBA and the incorporated documents create a vested right for retirees to obtain lifetime medical coverage benefits.

1

II.   **STATEMENT OF FACTS**

A.   <u>The Parties</u>

Plaintiffs David Kelly, Richard Norko, and Peter Dellolio are union members who worked at a plant in Stratford, Connecticut ("Plant") that produced a variety of aerospace products and gas turbine engines for Army helicopters and tanks. [Dkt. 45-2 (Def.'s Local Rule 56(a)(1) Statement), ¶ 1; Dkt. 54 (Pls.' Local Rule 56(a)(2) Statement), ¶ 1; *see* Dkt. 44-2 (Pls.' Local Rule 56(a)(1) Statement), ¶ 5; Dkt. 55-1 (Def.'s Local Rule 56(a)(2) Statement), ¶ 5].   They retired with a pension and medical coverage benefits between June 1997 and October 1998.   [*See* Dkt. 44-2, ¶¶ 1-3; Dkt. 55-1, ¶¶ 1-3]. Plaintiff Annette Dobbs is the surviving spouse of a deceased union retiree who retired with a pension and medical benefits in July 1999.   [Dkt. 44-2, ¶ 4; Dkt. 55-1, ¶ 4].   The Court certified a class consisting of all Honeywell retirees who retired since October 28, 1994, whose medical insurance benefits Honeywell announced it intends to terminate.   [*See* Dkt. 51 (Order Mot. Certify Class)].    Class members are retired Plant maintenance and production workers represented by the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") Local 1010 and office clerical and technical workers represented by UAW Local 376 (collectively, the "Union").

On September 30, 1998, the Plant, which was owned by Honeywell, closed.   [Dkt. 45-2, ¶ 42; Dkt. 54, ¶ 42].   Textron Corporation ("Textron") owned the Plant from 1984 until AlliedSignal, Inc. ("AlliedSignal") purchased

the Plant on or about October 28, 1994.  [Dkt. 45-2, ¶¶ 5-7; Dkt. 54, ¶¶ 5-7]. Honeywell subsequently acquired AlliedSignal, which operated the Plant until it closed.  [Dkt. 44-2, ¶ 7; Dkt. 55-1, ¶ 7].

Honeywell currently provides the named Plaintiffs and putative class members their medical coverage benefits and has done so throughout their retirement.  [*See* Dkt. 45-2, ¶ 8; 54, ¶ 8].  In December 2015 Honeywell announced that it would terminate such benefits on December 31, 2016, but pursuant to an agreement stemming from this litigation the benefits are currently scheduled to terminate on February 28, 2017.  [*See* Dkt. 53 (Pls.' Opp'n to Def.'s Mot. Summ. J.), at 1 n. 2].

B. <u>The Agreements</u>

The Plaintiffs' rights to retiree health benefits are governed by three agreements:  the Collective Bargaining Agreement ("CBA"), the Supplemental Agreement ("SA"), and the Effects Bargaining Agreement ("EBA") (collectively, "the Agreements"), the pertinent provisions of which are set forth below.  Textron and the Union negotiated and entered into the CBA, effective May 30, 1994.[1]  [*See* Dkt. 45-2, ¶ 9; Dkt. 54, ¶ 9; Dkt. 45-5 (Def.'s Mot. Summ. J. Ex. 3, Local 376/Textron CBA), at 4].  By this time, AlliedSignal

---

[1] Locals 1010 and 376 had a "tandem bargaining relationship" wherein Textron extended the agreement and economic package negotiated with Local 1010 to Local 376.  [Dkt. 45-2, ¶ 10; Dkt. 54, ¶ 10].  Local 376 negotiated their respective CBA separately but concurrently.  [Dkt. 45-2, ¶ 11; Dkt. 54, ¶ 11].  Ultimately, all agreements referenced in this case are substantially similar and the relevant provisions are materially identical.  [Dkt. 45-2, ¶ 11 n. 1; Dkt. 54, ¶ 11].  The Court will thus reference the Union agreements in the singular and cite to the Local 376 agreements.

was in discussions with Textron to purchase the Plant, and the sale was contingent upon a CBA negotiation acceptable to AlliedSignal. [*See* Dkt. 45-2, ¶ 14; Dkt. 54, ¶ 14]. AlliedSignal representatives did not directly participate in the process as they communicated only with Textron representatives, but they ultimately approved the CBA and acquired Textron. [*See* Dkt. 45-2, ¶¶ 16-17; Dkt. 54, ¶¶ 16-17]. The relevant CBA provisions are as follows:

- **Article XI, Group Insurance, Section 2**: "The details and levels of the Group Insurance benefits hereinabove specified are more fully described and incorporated in the Supplemental Agreement covering Insurance." [Dkt. 45-5, at 46].

- **Article XVIII, Effects Bargaining Agreement**: "The Company and the Union have agreed to certain terms, conditions and benefits which shall be applicable in the event that the Company should sell the assets to a third-party purchaser. These commitments will be incorporated into an Effects Bargaining Agreement which shall be a part hereof as a supplement." [*Id.* at 70].

- **Article XIX, Duration, Section 1**: "The Union agrees that during the term of the Agreement it will not make any demands, representation or requests to the Company or to any governing body to enter into collective bargaining negotiations with respect to employee pensions and other retirement programs, salaries, merit or promotional increases or any health welfare plan, inasmuch as these matters have been subject to the collective

4

bargaining procedure in accordance with the law and duly settled by this Agreement and not subject for further negotiations during its term or any addition, thereto."  [*Id.* at 71].

- **Article XIX, Duration, Section 3**: "Except as otherwise provided herein, this Agreement shall become effective May 30, <u>1994</u>, and shall remain in effect, up to and including <u>June 6, 1997</u>, and shall automatically renew itself from year to year thereafter unless written notice to terminate or amend the Agreement is given by either party to the other party at least sixty (60) days prior to its expiration or any annual renewal thereof."  [*Id.* at 72].

- **Article XIX, Duration, Section 3(b)**: "In the event that negotiations for an amended Agreement shall continue beyond the expiration of the term of this Agreement, this Agreement shall continue in full force and effect, provided, however, that either party may then terminate this Agreement upon ten (10) days written notice to the other party."  [*Id.* at 73].

As referenced in the CBA, Textron and the Union negotiated the SA conferring specific Group Insurance benefits, which included medical health care benefits offered to employees and retirees.  [*See* Dkt. 45-2, ¶¶ 28, 33; Dkt. 54, ¶ 28, 33].  AlliedSignal agreed to assume the provisions of the SA. [Dkt. 45-2, ¶ 37; Dkt. 54, ¶ 37].  The relevant SA provisions are as follows:

- **Article XX, General Provisions, Section 17(d)**: "If the Collective Bargaining Agreement is cancelled in whole or in part <u>benefits</u>

**hereunder** will immediately cease." **[Dkt. 45-7 (Def.'s Mot. Summ. J. Ex. 5, Local 376/Textron SA), at 78].**

- **Article XX, General Provisions, Section 23(b): "This Agreement shall be effective as of May 30, 1994, and shall remain in full force and effect without change, to and including June 6, 1997 and shall automatically renew itself from year to year thereafter unless written notice to terminate or amend this Agreement shall be given by either party to the other at least sixty (60) days prior to the renewal thereof. . . . [I]n the event that such negotiations shall continue beyond the expiration of the term of this Agreement, this Agreement shall continue in full force and effect, provided, however, that either party may terminate this Agreement upon ten (10) days written notice to the other party." [*Id.* at 83].**

Textron and the Union also entered into the EBA, which delineated the benefits to which the Union's members would be entitled upon and after AlliedSignal's acquisition of Textron.  [Dkt. 45-2, ¶ 19; Dkt. 54, ¶ 19; Dkt. 45-9 (Def.'s Mot. Summ. J. Ex. 7, Local 376/Textron EBA), at 1].  AlliedSignal agreed to assume the provisions of the EBA.  [Dkt. 45-2, ¶ 37; Dkt. 54, ¶ 37]. The relevant EBA provisions are as follows:

- **INSURANCE, 1(b): "The coverage to be furnished shall include the Group Medical Plan for the bargaining unit which is to be effective under the 1994 labor agreement, as well as the life insurance and AD&D coverage likewise so effective. Dependent coverage shall**

continue for employees having such coverage when laid off."  [Dkt. 45-9, at 1-2].

- **PENSIONS, 2**: "(a) All current retirees shall continue to receive monthly pension benefits as provided for under the Pension Plan.  (b) *All past and future retired employees and surviving spouses shall continue to receive* their full monthly pension, including supplements if any, and *full medical coverage* as provided in the Pension Plan and Group Insurance Agreement, as now in effect or as hereafter modified by the parties *for the life of the retiree or surviving spouse*." [*Id.* at 2 (emphasis added)].

- **DURATION (19)**: "This Effects Bargaining Agreement shall be effective as of May 30, 1994, and shall remain in effect until midnight on June 6, 1997, but not thereafter unless renewed or extended in writing by the parties.  It is understood that expiration of this Agreement shall not foreclose . . . the post-expiration presentation in a timely fashion of claims regarding matters arising out of the application of its terms prior to the expiration date."  [*Id.* at 16].

The Agreements represent the last collectively-bargained agreements to govern the Plant workers' benefits.  [Dkt. 45-2, ¶ 25; Dkt. 54, ¶ 25].  They became effective May 30, 1994, and expired on June 6, 1997.[2]  [Dkt. 45-2, ¶¶ 25, 40; Dkt. 54, ¶¶ 25, 40].

---

[2] **The duration provisions in the CBA and SA provide they "shall automatically renew . . . from year to year . . . unless written notice to terminate or amend the Agreement is given. . . ."  [Dkt. 45-5, at 72; Dkt. 45-7,**

III.   **LEGAL STANDARD**

Summary judgment should be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that no genuine factual disputes exist. *See Vivenzio v. City of Syracuse,* 611 F.3d 98, 106 (2d Cir. 2010). "In determining whether that burden has been met, the court is required to resolve all ambiguities and credit all factual inferences that could be drawn in favor of the party against whom summary judgment is sought." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)). If there is any evidence in the record that could reasonably support a jury's verdict for the nonmoving party, summary judgment must

---

at 83]. AlliedSignal gave notice to Local 1010 and 376 of its intention to terminate the CBA "and all related side letters and/or sub-agreements or appendices of any nature" effective midnight June 6, 1997. [Dkt. 45-19 (Ex. 17, AlliedSignal Notice to Local 1010); Dkt. 45-19 (Ex. 18, AlliedSignal Notice to Local 376)]. The Court determines these letters to be sufficient notice of intent to terminate the Agreement, wherein negotiations would commence pursuant to Article XX Section 23(b) of the CBA and Article XX Section 23(b) of the SA. [*See* Dkt. 45-5, at 73; Dkt. 45-7, at 83]. There is no documentary evidence indicating either party provided ten days written notice of termination post-expiration, but during a hearing before an ALJ in *In re Allied Signal Aerospace, a Division of Allied Signal, Inc.,* Nos. 34-CA-7898-2, 34-CA-7905 (N.L.R.B. Oct. 6, 1998), counsel questioning Mr. Bocik (Vice President of Labor Relations for AlliedSignal) stated, "We all agree the contracts were expiring on June 6, 1997." [Dkt. 45-18 (Def.'s Mot. Summ. J. Ex. 16 (NLRB Hearing, Oct. 6, 1998), at 100:13-101:2]. The parties do not dispute that the Agreements expired on June 6, 1997. [*See* Dkt. 45-2 ¶¶ 25, 40; Dkt. 54 ¶¶ 25, 40]. While the Court notes that counsel's reference to "the contracts" during the NLRB hearing is vague, and may have referred only to Locals' EBA contracts, the Court finds the totality of evidence and parties' stipulation is sufficient to establish the Agreements all terminated on June 6, 1997.

be denied." *Am. Home Assurance Co. v. Hapag Lloyd Container Linie, GmbH,* 446 F.3d 313, 315–16 (2d Cir. 2006) (internal quotation marks and citation omitted).   In addition, determinations of the weight to accord evidence or assessments of the credibility of witnesses are improper on a motion for summary judgment, as such are within the sole province of the jury. *Hayes v. New York City Dep't of Corr.*, 84 F. 3d 614, 619 (2d Cir. 1996).

"In order to defeat a summary judgment motion that is properly supported by affidavits, depositions, and documents as envisioned by Fed. R. Civ. P. 56(e), the opposing party is required to come forward with materials envisioned by the Rule, setting forth specific facts showing that there is a genuine issue of material fact to be tried." *Gottlieb v. Cty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citation omitted).   A plaintiff may not rely solely on "the allegations of the pleadings, or on conclusory statements, or on mere assertions that affidavits supporting the motion for summary judgment are not credible. *Id.* (internal citations omitted).   "At the summary judgment stage of the proceeding, [a plaintiff is] required to present admissible evidence in support of her allegations; allegations alone, without evidence to back them up, are not sufficient." *Welch–Rubin v. Sandals Corp.,* No. 3:03CV481 (MRK), 2004 WL 2472280, at *1 (D. Conn. Oct. 20, 2004) (citing *Gottlieb*, 84 F.3d at 518); *see Martinez v. Conn. State Library*, 817 F. Supp. 2d 28, 37 (D. Conn. 2011).   Where there is no evidence upon which a jury could properly proceed to find a verdict for the party producing it and upon whom the onus of proof is imposed, such as where the evidence

offered consists of conclusory assertions without further support in the record, summary judgment may lie.  *See Fincher v. Depository Trust and Clearance Co.*, 604 F.3d 712, 726-27 (2d Cir. 2010).

On cross-motions for summary judgment the same standard applies. *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "Where 'parties file[ ] cross-motions for summary judgment [,] . . . each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration."  *Fireman's Fund Ins. Co. v. Great Am. Ins. Co. of New York*, 822 F.3d 620, 631 n. 12 (2d Cir. 2016) (citing *Morales*, 249 F.3d at 121)).

## IV.   ANALYSIS

Counts I and II relate to Defendant's ERISA violation under 29 U.S.C. § 1132 for Defendant's alleged anticipatory breach of the CBA and incorporated agreements in deciding to terminate Plaintiffs' lifetime full medical coverage benefits.  Count III is a breach of fiduciary duty claim relating to the Defendant's decision to terminate such benefits.  The Court will first address Counts I and II together and then address Count III.

### A. Contractual Vesting

Resolution of the motions for summary judgment before the Court raises a question of law, namely the interpretation of the Agreements.  The Labor Management Relations Act ("LMRA") confers jurisdiction upon federal courts to "resolve disputes between employers and labor unions about

collective-bargaining agreements."  *M & G Polymers USA, LLC v. Tackett*,
135 S. Ct. 926, 933 (2015) (citing 29 U.S.C. § 185). Plaintiffs allege their
collectively bargained lifetime full medical coverage constitutes an
employee welfare benefit plan under ERISA, 29 U.S.C. § 1002(1). [Dkt. 1 (Pls.'
Complaint), ¶¶ 47-53].  A plaintiff may bring a civil action under ERISA, 29
U.S.C. § 1132, "(A) to enjoin any act or practice which violates . . . the terms
of the plan, or (B) to obtain other appropriate equitable relief (i) to redress
such violations or (ii) to enforce any provisions of . . . the terms of the plan.
. . ." 29 U.S.C. § 1132(a)(3).  There are two types of employee benefit plans
set forth under ERISA: pension plans and welfare benefit plans.  *See* 29
U.S.C. §§ 1002(1)-(3).  Any pension and welfare benefits plans found within a
collective-bargaining agreement is subject to the rules under ERISA.  *See* 29
U.S.C. § 1002(1) (defining "employee welfare benefit plan" or "welfare benefit
plan"), § 1002(2)(A) (defining "employee pension benefit plan" or "pension
plan"); *Tackett*, 135 S. Ct. at 933.  In sum, the LMRA confers the right to sue
in federal court to resolve a dispute from a collective bargaining agreement,
while ERISA states the rights which a party may seek to enforce in that suit,
and as such the Court addresses the Plaintiffs' ERISA claim for their alleged
lifetime medical coverage benefits.

ERISA treats pension plans and welfare benefits plans differently,
specifically with respect to the vesting of such plans; ERISA explicitly
exempts welfare benefits plans from minimum funding and vesting
standards that govern pension plans.  *See Tackett*, 135 S. Ct. at 933 (citing

11

29 U.S.C. §§ 1053, 1082, 1083, 1084, 1051(1), 1081(a)(2)).  In general, ERISA does not create a "substantive entitlement to employer-provided health benefits or any other kind of welfare benefits," and therefore an employer may "adopt, modify, or terminate welfare plans." *Devlin v. Empire Blue Cross and Blue Shield*, 274 F.3d 76, 82 (2d Cir. 2001) (quoting *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78 (1995)).  An employee's right to ERISA-regulated welfare benefits does not vest unless and until the employer says they do. *Curtiss-Wright Corp.*, 514 U.S. at 78.  Where a plan unambiguously indicates retiree benefits are vested the plan will be enforced.  *See id.*; *In re AMR Corp.*, 508 B.R. 296, 307 (Bankr. S.D.N.Y. 2014) (stating that ERISA permits an employer to agree to vest employee welfare benefits); *Abbruscato v. Empire Blue Cross and Blue Shield*, 274 F.3d 90, 97 (2d Cir. 2001) (referring to this principle as "contractual vesting).

### i. *Ordinary Contract Principles*

Approximately two years ago in *M&G Polymers USA, LLC v. Tackett*, 135 S. Ct. 926 (2015), the United States Supreme Court issued a unanimous decision clarifying how to properly interpret collective-bargaining agreements.  The CBA at issue and its related Pension, Insurance, and Service Award Agreement provided retirees, their surviving spouses, and their dependents with "a full Company contribution towards the cost of [health care] benefits" and that the benefits would be given "for the duration of this Agreement" subject to renegotiation in three years.  *Id.* at 931.  The Court held that ordinary principles of contract law must be applied to

12

interpret the CBA to the extent they are consistent with federal labor policy. *Id.* at 933 (abrogating *Int'l Union, United Auto., Aerospace, and Agric. Implement Workers of Am. (UAW) v. Yard-Man, Inc.*, 716 F.2d 1476 (6th Cir. 1983)).[3]

*Tackett* re-establishes several contract principles that guide this Court today.   First, "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent."   *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:6, p. 108 (4th ed. 2012) (Williston)).   A court may draw upon "known customs or usages in a particular industry" to determine the meaning of the contract, but can only do so if the parties provide evidentiary support thereof.   *Id.* at 935.   Second, the Court acknowledged that welfare benefits generally are free to be adopted, modified, or terminated by the employer, but reminded lower courts that "[p]arties, however, can and do voluntarily agree to make retiree benefits a subject of mandatory collective bargaining."   *Id.* at 936. Third, "courts should not construe ambiguous writings to create lifetime promises."   *Id.*   Fourth and by like measure, the contractual obligation ceases in the ordinary course when the CBA is terminated, although "[t]hat

---

[3] While ordinary principles of contract law apply, with respect to the interpretation of labor laws the Court acknowledges that "[f]ederal interpretation of the federal law will govern, not state law."   *Textile Workers Union of Am. v. Lincoln Mills of Alabama*, 353 U.S. 448, 457 (1957); *New York v. Nat'l Servs. Indus., Inc.*, 352 F.3d 682, 686 (2d Cir. 2003); *Peters v. Sikorsky Aircraft Corp.*, No. 3:04cv1066 (PCD), 2006 WL 2331077, at *5 (D. Conn. Aug. 10, 2006) (stating that § 301 of the LMRA is interpreted to give "federal courts the authority to fashion a uniform federal common law to resolve disputes over collective bargaining agreements").

principle does not preclude the conclusion that the parties intended to vest lifetime benefits for retirees."  *Id.* at 937.  The Court expressly noted that a CBA can state "in explicit terms that certain benefits continue after the agreement's expiration.  But when a contract is silent as to the duration of retiree benefits, a court may not infer that the parties intended those benefits to vest for life."  *Id.* (internal quotation marks and citations omitted).

Notably, Justice Ginsburg in her concurring opinion added that in applying ordinary contract principles, "the intention of the parties, *to be gathered from the whole instrument,* must prevail."  *Id.* (quoting 11 R. Lord, Williston on Contracts § 30:2, p. 27 (4th ed. 2012) (Williston)) (emphasis added).  Even after a CBA has expired, a court may look at explicit terms or implied terms of the expired agreement to place constraints on the employer. *Id.* at 938; *see also Litton Fin. Printing Div., Div. of Litton Bus. Sys., Inc.*, 501 U.S. 190, 203 (1991) (noting that one "source of possible constraints upon the employer after the expiration date of a collective-bargaining agreement" is "from the express or implied terms of the expired agreement itself").  For example, the existence of "a provision stating that retirees 'will receive' health-care benefits if they are 'receiving monthly pension'" is relevant because retirees have an automatic vested right to pensions under ERISA. *Id.*  A "survivor benefits" clause is also relevant to the extent it gives the surviving spouse the ability "to receive [the retiree's heath-care] benefits . . . until death or remarriage" if the retiree dies.  *Id.*

14

### ii. _Other Honeywell Cases_

Post-_Tackett_, it appears that Honeywell has with respect to other unions decided to alter its longstanding practice of providing retirees with medical coverage benefits.  Vice President and Deputy General Counsel for all of human resources at AlliedSignal, Kevin Covert, testified that he re-evaluated CBAs for six to seven months after the _Tackett_ decision.[4]  [Dkt. 45-17 (Covert Dep.), at 14:2-21].

In _Fletcher v. Honeywell Int'l, Inc._, No. 3:16-cv-302, slip op. at 1 (S.D. Ohio Nov. 15, 2016), Honeywell notified retirees and their spouses on December 28, 2015, that "Honeywell intends to terminate the retiree medical and prescription drug coverage currently provided to you and your covered dependents as of December 31, 2016."  The healthcare and prescription drug coverage had been negotiated through a series of CBAs, the latest of which expired on May 22, 2014, pursuant to the terms of the durational clause.  _Id._ at 1, 6. The provisions of the CBA expressly guaranteed lifetime pension benefits but not lifetime health care benefits.  _Id._ at 4.  The court denied the Motion to Dismiss after determining the relevant provisions of the contract to be ambiguous with respect to the parties' intent to vest lifetime retiree benefits.  _Id._ at 12.

Under similar circumstances, the court in _Watkins v. Honeywell Int'l, Inc._, No. 3:16CV01925, slip op. at 1 (N.D. Ohio Dec. 16, 2016) arrived at the

---

[4] **The parties did not provide the Court any excerpts of the deposition wherein he testified to his conclusions after reviewing the CBAs.**

opposite conclusion for a CBA provision relating to health care benefits for retirees, their spouses, their dependents, and surviving spouses. The 2009 CBA, which terminated in 2011, incorporated an Insurance Program that provided the following for retirees: "The continued coverage to which retired employees are entitled will be only the hospital-surgical-medical-drug-dental-hearing aid coverages as described in Section 1 above." *Id.* (quoting Doc. 19, Ex. 2)). The general duration provision of the Insurance Program expressly stated the Insurance Program would be effective "[f]or the duration of the *Agreement.*" *Id.* at 2. The court found that "nothing in the CBAs affirmatively states that Honeywell committed itself to provide healthcare benefits for the life to the Insurance Program's beneficiaries." *Id.* at 5. The court drew upon the CBA's explicit vesting of pension benefits for life and noted the absence thereof for healthcare benefits. *Id.* at 6. With this observation in mind, the court granted the defendant's Motion to Dismiss.

The Court recognizes that the Agreements in this case do not contain the same language as those referenced in the aforementioned Honeywell cases. As is the nature of collective-bargaining, each local union may bargain with the employer to achieve different results, and the Union in this case believed its CBA to be top notch. On July 21, 1994, the Union provided its members with a Tentative Agreement report at the ratification meeting, which stated,

> This Agreement breaks new ground in many areas, especially with its lifetime guarantees of protection for retiree pensions and medical coverage. . . . We believe this proposed contract and effects agreement being presented today is the best

16

agreement in the entire aerospace industry.  We say that with confidence because we've researched them all.

[Dkt. 24-10 (Opp'n Mot. Dismiss Ex. 10, Local 1010 UAW Tentative Agreement 1994-1997), at 1].  Therefore, the Court uses these Honeywell cases as a point of comparison to interpret the provisions at issue with the understanding that some CBAs may be more favorable to employees than others.

### iii.   *The Agreements Before This Court*

The first question the Court must answer is whether the EBA language "for the life of" gave retirees and their surviving spouses a contractually vested right in full medical coverage benefits for their entire lives.  If the answer is yes, the question the Court must then address is whether certain individuals may not be entitled to these said rights because the Agreements expired before the individual retired.

### 1.   *"For the Life Of" Is A Lifetime Duration*

The parties fundamentally agree about the law surrounding contractual vesting, as they both rely on *Tackett* and "ordinary principles of contract law," and they both argue the CBA and related documents are unambiguous.  [Dkt. 45-1, at 9; Dkt. 44-1, at 14-17].  The parties instead disagree about how the Court should apply such principles to the EBA provision: "for the life of the retiree or surviving spouse."  Plaintiffs argue that the phrase constitutes an "explicit term[ ]" that unambiguously vests medical coverage benefits for the lifetime of the retiree even after the CBA's expiration.  [Dkt. 44-1, at 14; *see Tackett*, 135 S. Ct. at 937].  Defendant contends the phrase unambiguously does not vest such benefits on retirees,

17

because when read in light of the surrounding provisions it is clear the SA expressly conditioned medical benefits on the existence of the CBA, which expired in June 1997.  [Dkt. 45-1, at 11-12; *see Seabury Constr. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 69 (2d Cir. 2002)].  Defendant also relies on the EBA's durational clause to argue the retiree medical benefits did not vest.  [Dkt. 45-1, at 15].  In summary, the Plaintiffs believe the phrase alone is dispositive, and the Defendant believes the associated agreements are instructive of the intent for the rights to cease after the contract expiration.

The Court finds that the application of "ordinary principles of contract law" is a bit more nuanced than the contentions of either party.  As noted above, it is well established that welfare benefits such as medical benefits do not automatically vest under ERISA and in most situations the employer can adopt, modify, or terminate them for any reason.  *Abbruscato*, 274 F.3d at 96-97.  However, parties are free to contract around this presumption, and the benefits will be enforced if "the plan documents contain specific written language that is reasonably susceptible to interpretation as a promise to vest the benefits."  *Bouboulis v. Transp. Workers Union of Am.*, 442 F.3d 55, 60 (2d Cir. 2006) (internal quotations marks omitted); *see Tackett*, 135 S. Ct. at 936 ("Parties, however, can and do voluntarily agree to make retiree benefits a subject of mandatory collective bargaining.").

The existence of "lifetime" language does not automatically indicate the benefits have vested.  In *Abbruscato*, 274 F.3d at 94, 99, the Second Circuit held that the retirees' life insurance coverage was "not susceptible

to an interpretation that promises vested lifetime insurance benefits" even though the plan provided "that 50% of your life insurance coverage *remains in force for the rest of your life, at no cost to you*," because the Benefit Administration section of the same plan stated, "The company expects and intends to continue the Plans in your Benefits program indefinitely, *but reserves its right to end each of the Plans, if necessary.  The company also reserves its right to amend each of the Plans at any time.*"  *Id.* at 94 (emphases added).  The Second Circuit expressly limited the holding to situations where the same document contained both the promise *and* the reservation of rights.  *See id.* at 100.

Here, the documents present a different situation.  Like the plan in *Abbruscato*, the EBA contains a clause that appears to provide lifetime coverage, as it clearly states, "All past and future retired employees and surviving spouses shall *continue to receive* their full monthly pension, including supplements if any, *and full medical coverage* as provided in the Pension Plan and Group Insurance Agreement, *as now in effect or as hereafter modified by the parties* <u>for the life of</u> the retiree or surviving spouse*."  [Dkt. 45-9, at 2 (emphases added)].  Unlike the plan in *Abbruscato*, the EBA does not have a reservation of rights clause.  Rather, the EBA only contains a duration clause: "This [EBA] . . . shall remain in effect until midnight on June 6, 1997, but not thereafter unless renewed or extended in writing by the parties.  It is understood that expiration of this Agreement shall not foreclose . . . the post-expiration presentation in a timely fashion of

19

claims regarding matters arising out of the application of its terms prior to the expiration date." [*Id.* at 16]. The Second Circuit has held that a CBA containing "lifetime" language but no reservation of rights clause is enforceable as a unilateral contract. *See Devlin*, 274 F.3d at 84 ("Where the offeror did not explicitly reserve the power to revoke, such an offer cannot be revoked once the offeree has begun to perform."); *compare Devlin*, 274 F.3d at 84 *with Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 484 (7th Cir. 2006) (finding that limiting benefits "for the period of this agreement" is a reservation of rights clause).

Moreover, the mere existence of "a general duration clause is not necessarily inconsistent with the 'express or implied' terms that may promise 'that certain benefits continue after the agreement's expiration." *Int'l Union v. Kelsey-Hayes Co.*, 130 F. Supp. 3d 1111, 1119 (E.D. Mich. 2015) (quoting *Tackett*, 135 S. Ct. at 937). Indeed, "[a]ll collectively-bargained vested benefits are promised in limited-duration CBAs with general duration clauses." *Id.* (where the CBA contained a duration clause for the whole CBA expiration but also specific "retiree health care" and "retiree medical" provisions). This logic is consistent with *Tackett* wherein Justice Thomas noted, "[W]e have already recognized that 'a collective-bargaining agreement [may] provid[e] in explicit terms that certain benefits continue after the agreement's expiration." *Tackett*, 135 S. Ct. at 937 (quoting *Litton*, 501 U.S. at 207). Such a determination comports with the "ordinary principle of contract law" that "specific terms and exact terms are given greater

weight than general language."  Restatement (Second) of Contracts § 203(c) (Am. Law Inst. 1981).  Here, the CBA, SA, and EBA each contain general duration clauses applicable to the entire provisions, but the Court must give greater weight to the specific retiree medical coverage benefit provision of the EBA granting such benefits for the lifetime of the retirees and surviving spouses.[5]  The Court distinguishes this case from *Watkins*, where the CBA between the union and Honeywell contained a general duration clause *without* "affirmatively stat[ing] that Honeywell committed itself to provide healthcare benefits for the life to the Insurance Program's beneficiaries."  *Watkins*, slip op. at 5.

The Court is not persuaded by the Defendant's contention that the durational language in the SA is "materially indistinguishable from the reservation of rights clause."  [Dkt. 45-1, at 13].  Defendant cites *Grove v. Johnson Controls, Inc.*, No. 1:12-CV-02622, 2016 WL 1271328 (M.D. Pa. Mar. 31, 2016), wherein the CBA lacked an express reservation of rights clause. Defendant argues that in *Grove* "the court nonetheless concluded that a provision stating '[i]n the event [the] group plan is terminated, coverage for [retirees] and [their] dependents will end immediately' showed 'that the Company retained the power to terminate benefits, and, as such, any intent to vest benefits would have rendered the provisions superfluous.'"  [Dkt. 45-

---

[5] **The Court finds that the SA language, "If the [CBA] is canceled in whole or in part <u>benefits hereunder</u> will immediately cease," is a general durational clause found within the "General Provisions" section.  The language of this section addresses "employees" rather than "retirees."**

1, at 13 (quoting *Grove*, 2016 WL 1271328 at *17)].  There is a fundamental difference between *Grove* and the case before us that Defendant overlooked.  The CBA in *Grove* referenced by Defendant dealt with different "lifetime" language: "Your health coverage is continued *until your death*—unless you request termination of coverage or you do not make the required contribution for this Plan.  And your dependents' health coverage will be continued—*while you are living. . . .* [Surviving spouses] will remain eligible *until the earlier of death or remarriage*."  *Id.* at *15.  The district court in *Grove* noted that "until your death" language is "not the functional equivalent of lifetime language," which according to the Seventh Circuit in *Bland v. Fiatallis N.A., Inc.*, 401 F.3d 779, 786 (7th Cir. 2005) is "stronger and more explicit" with respect to vesting and means "for life."[6]   *Grove*, 2016 WL

---

[6] In *Bland*, the Seventh Circuit denied summary judgment on the basis that the contract containing lifetime language without a reservation of rights clause was ambiguous as to vesting.  *Id.* at 786-87 ("Further, in the absence of a reservation of rights clause, we are convinced (not surprisingly) that in the case before us 'lifetime' is durational, meaning 'for life.'").  The "lifetime" language in the *Bland* contracts are as follows:

"Lifetime" language is found in three plan documents. Thus, the "Benefit for Retired Salaried Employees Plan" document covering retired salaried employees who retired after Dec. 31, 1976, provides that health insurance and dental "... coverage remains in effect as long as you or your surviving spouse are living." In addition, the "Health Benefits Plan" and "Benefits for Retired Hourly Employees Plan" documents distributed to hourly employees at FANA's Carol Stream and Deerfield plants state that "[i]f a retired employee dies, the surviving spouse will have basic coverage continued for his or her lifetime at no cost." Finally, the "Benefit Fact Sheets" provided to salaried employees affected by shutdown of FANA's Springfield plant state that employees would have "the retired employee benefits in effect prior to March 1, 1985," which plaintiffs contend were

1271328 at *17. Therefore, while the court determined that the "until your death" language was limited to the existence of the CBA, the court likely would have reached the opposite conclusion if the court had the Agreement language before this Court, given its clear direction from the Seventh Circuit.

Defendant raises two more issues that the Court will now address. First, Defendant cites the Surviving Dependent Coverage clause of the 1994 Local 1010 SA, which states, "[s]urviving dependents of a deceased retiree (except Deferred Vested) shall remain covered for benefits under the provision of this Agreement until (1) the date of death or remarriage of a surviving spouse . . . ," to argue that the surviving spouse medical benefits did not survive the expiration of the CBA. [*See* Dkt. 45-1, at 20]. The Court finds this provision inapplicable as it addresses coverage *only* for surviving dependents and Defendant's cited cases contain language explicitly addressing surviving spouses. *See Cherry*, 441 F.3d at 483 (finding that "a clause that provides benefits for *surviving spouses* until their death or remarriage" did not implicitly extend the collectively-bargained insurance agreement beyond the three-year term) (emphasis added); *John Morrell & Co. v. United Food and Commercial Workers Int'l Union, AFL-CIO*, 37 F.3d 1302, 1307 (8th Cir. 1994) (where the relevant language was, "the above coverage shall continue for the *surviving spouse* and dependent children until the earlier of the surviving spouse's death or remarriage") (emphasis

---

those established in the "Benefit for Retired Salaried Employees Plan," noted above.
*Id.* at 784-85 (emphases added).

added).  The Court will thus focus on the provision in the EBA that explicitly address surviving spouse benefits—"for the life of the retiree or surviving spouse"—as benefits for surviving dependents is not at issue in this case.

Second, Defendant argues that it is of no import that the clause "for the life of the retiree or surviving spouse" appears within the EBA's *pension* section: "All past and future retired employees and surviving spouses shall continue to receive their *full monthly pension*, including supplements if any, and full medical coverage as provided in the Pension Plan and Group Insurance Agreement, as now in effect or as hereafter modified by the parties for the life of the retiree or surviving spouse."  [Dkt. 45-1, at 21-23 (emphasis added); Dkt. 45-9, at 1 (emphases added)].   "[T]ying language could shed light on the parties' intent when it connected the *duration* of pensions to the *duration* of health benefits (*e.g.,* "[R]etirees 'will receive' health-care benefits *if they are* 'receiving a monthly pension')."  *Gallo v. Moen Inc.*, 813 F.3d 265, 272 (6th Cir. 2016) (citing Justice Ginsburg's concurrence in *Tackett*, 135 S. Ct. at 938).  The Court acknowledges that the connection between medical coverage benefits and pensions is not tied in the same manner as Justice Ginsburg's example, *see Tackett*, 135 S. Ct. 926 at 938, but notes that the similar language for both medical coverage and pensions supports the weight of evidence within the contract of the Plaintiffs' vested rights.

For the aforementioned reasons, the Court finds that the language, "for the life of the retiree or surviving spouse" unambiguously indicates a contractually vested right to lifetime full medical coverage benefits.

### 2. *Eligibility for Contractually Vested Medical Coverage Retirement Benefits is Ambiguous*

The second question is whether all employees, including those who retired *after* the Agreements expired, should be entitled to contractually vested lifetime full medical coverage benefits.  Although the language of the contract unambiguously vests medical coverage benefits "for the life of the retiree or surviving spouse," the Court finds that the phrase, "All past *and future* retired employees and surviving spouses shall continue to receive . . ." is ambiguous as to whether the benefits vest prior to or subsequent to the employee's retirement.  [Dkt. 45-9, at 2 (emphasis added)].

"[T]o vest means '[t]o give (a person) an immediate, fixed right of present or future enjoyment."  *In re AMR Corp.*, 508 B.R. at 313 (quoting Black's Law Dictionary (9th ed. 2009)).    Should the lifetime benefits vest *prior* to retirement, i.e. by virtue of the employment or retirement eligibility, any employee working at the Plant from 1994 until the Plant's closure may have been entitled to lifetime medical coverage.  Plaintiffs advocate for this interpretation.  [*See* Dkt. 53, at 1 n. 1].  Should the lifetime benefits vest *subsequent* to retirement, only employees who retired prior to the expiration of the Agreements on June 6, 1997 would be entitled to receive such benefits.  *See Tackett*, 135 S. Ct. at 937 ("[C]ontractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement.") (quoting *Litton*, 501 U.S. at 207).  Therefore, it is of critical importance that the Court is presented with evidence sufficient to determine the moment through which lifetime medical coverage benefits are vested to the retirees.

The parties have not presented the Court with any persuasive case law as to this issue.[7]  When a court is confronted with ambiguous language, "the ultimate determination of whether [the employer] promised lifetime benefits should be left to a trier of fact, likely assisted by extrinsic evidence to clarify the meaning of this ambiguous language."  *Devlin*, 274 F.3d at 85. After analyzing the various agreements, the Court requires a hearing on the limited issue of whether and at what point lifetime medical coverage benefits became vested for employees who retired after the Agreements expired on June 6, 1997.  *See Reese v. CNH Am. LLC*, No. 04-70592, 2006 WL 2540952, at *1 (E.D. Mich. Aug. 31, 2006) (addressing class certification and noting, "If, for example, the language of the 1998 CBA demonstrates that the parties intended for health insurance benefits for retirees to vest upon an employee's eligibility for retirement, the current class is not overbroad").

Here, there is extrinsic evidence of the parties' intent, which suggests that the parties intended all retirees, including those who retired after the Agreements expired, to have vested lifetime medical coverage benefits. First, the Court notes that Defendant's payment of medical coverage from

---

[7] **Cases about the rights of "past and future" retirees merely reaches general conclusions about vesting.  *See, e.g., Zino v. Whirlpool Corp.*, 47 F. Supp. 3d 561, 582 (N.D. Ohio 2014) (finding the employer's rejection of the Union's proposed contract settlement language—"Group insurance for past and future retirees remain the same"—"creates an inference that benefits at issue are possibly not vested"); *Jensen v. Greyhound Corp*, 692 F. Supp. 1029, 1041 (N.D. Iowa 1987) (holding agreement language, for example where insurance benefits "shall continue in effect" for past and future retirees, supports a finding of vested lifetime benefits, although applying case law later abrogated by *Tackett*).**

the expiration of the contract until present to employees who retired after the contract expiration (or their surviving spouses) weighs heavily in favor of a finding that the Agreements lifetime benefits vested for these individuals.

Second, the Court finds it persuasive that Plaintiffs submitted into evidence a total of 15 letters sent on June 1, 1998 (shortly before the Plant's closure and after the expiration of the Agreements), from AlliedSignal and Local 1010 representatives to various union members, whereby the Pension Board notified the union member of his or her early retirement pension eligibility.  [Dkt. 24-12 (Pls.' Opp'n Mot. Dismiss Ex. 12, Pension Board Letters, June 1, 1998)].  Part of the early retirement pension benefits listed are medical benefits, which include hospital insurance, basic medical insurance, major medical insurance, dental insurance, prescription drug insurance, and vision care insurance.  [*Id.*].  Such evidence is indicative of two things: (1) that Plaintiffs who retired after the expiration of the Agreements already had vested rights in lifetime medical coverage, and (2) that medical coverage benefits may have been intended to be incorporated as pension benefits.

Third, AlliedSignal sent a letter to Former AlliedSignal Stratford Army Plant Employees on September 30, 1998, regarding the plant closure that would happen that day.  [Dkt. 24-15 (Opp'n Mot. Dismiss Ex. 14, AlliedSignal Plant Closure Letter, Sept. 30, 1998)].  The letter stated that the Retirement Benefits Administration Office would supply information on retirement or retiree medical benefits and would "assist [the individual] on such issues"

including "applying for retirement" and "applying for retiree medical benefits." [*Id.*]. As the letter refers broadly to the medical coverage benefits for retirees, the logical conclusion is that the retiree medical benefits would be for life as stated in the Agreements.

Fourth, as recently as 2005 Honeywell added a reservation of rights clause to an Annual Enrollment document, but contacted David Kelly, who retired *after* contract expiration, and possibly other retirees to say the reservation of rights "does not pertain to retiree medical benefits negotiated by a collective bargaining unit. Therefore please use this letter as a source to disregard the statement." [Dkt. 24-21 (Opp'n Mot. Dismiss Ex. 21, Honeywell Letter, March 18, 2005)]. Honeywell had previously made the determination that "he and his spouse are eligible for lifetime retiree medical coverage." [Dkt. 24-13 (Opp'n Mot. Dismiss Ex. 13, AlliedSignal Letter, June 9, 1998)].

Lastly, the Court finds informative the Local 1010 UAW Decision & Effects Agreement (July 21, 1994) report provided to Local 1010 members by the Union. The report states, "The Purchaser (Allied Signal) agrees to provide the full negotiated pension and medical coverage for all Local 1010 retirees and surviving spouses *who retire after the date of this agreement* for the life of the retiree and surviving spouse." [Dkt. 24-11 (Opp'n Mot. Dismiss Ex. 11, Decision & Effects Agreement), at 1 (emphasis added)]. An argument can be made for both parties: (1) in favor of Plaintiffs, that any Local 1010 employee who retires after the 1994 EBA takes effect can have lifetime

medical coverage benefits; or (2) in favor of Defendants, that the individual must be a retiree or surviving spouse while the EBA is in effect.  The Court notes that while AlliedSignal agreed to provide for union members through the provisions of the EBA, Covert testified that he primarily used the CBA and SA to re-analyze the vesting of retiree medical coverage benefits after the *Tackett* decision was rendered.  [Dkt. 45-17, at 19:19-25].  Covert did not mention the EBA.  As the express language of the contract is ambiguous and the extrinsic evidence is insufficiently developed, the Court finds that cross-motions for summary judgment should be denied as to this potential subclass of individuals who retired after the Agreements expired on June 6, 1997.

### B. Fiduciary Duty

Plaintiffs contend that Honeywell breached its fiduciary duty under ERISA § 404(a) by "determining that it had a contractual right to terminate these benefits without making any effort to obtain, let alone analyze, the plan documents, including the CBAs and the EBAs that it had promised the federal government it would honor."  [Dkt. 1, ¶ 58].  The language under ERISA §§ 404(a)(1)(A), (B), and (D) provides:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and— (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; . . . (D) in accordance with the documents and instruments governing the

> plan insofar as such documents and instruments are consistent with the provisions of this subchapter and subchapter III of this chapter.

29 U.S.C. §§ 1104(a).  The threshold question for breach of ERISA fiduciary duty is "whether that person was acting as a fiduciary (that is, was performing a fiduciary function) when taking the action subject to complaint." *Bell v. Pfizer*, 626 F.3d 66, 73 (2d Cir. 2010) (quoting *Pegram v. Herdrich*, 530 U.S. 211, 226 (2000)).  A fiduciary must carry out said duties pursuant to ERISA "to the extent that he or she exercises any discretionary authority or discretionary control respecting management of the plan, or has any discretionary authority or discretionary responsibility in the administration of the plan." *Devlin*, 274 F.3d at 87 (quoting *Varity Corp. v. Howe*, 516 U.S. 489, 498 (1996)) (internal quotation marks omitted).  Such fiduciary duties under ERISA apply to both pension and welfare plans. *Lockheed Corp. v. Spink*, 517 U.S. 882, 891 (1996).

An employer is entitled to "wear two hats" as a plan administrator and employer, and "not all actions by an employer fall under a fiduciary role." *Bell*, 626 F.3d at 74.  With respect to the scope of the fiduciary's duties, there is a distinction between fiduciary functions that trigger ERISA liability and "settlor" functions that do not. *Coulter v. Morgan Stanley & Co. Inc.*, 753 F.3d 361, 367 (2d Cir. 2014).  "Fiduciary duties include, for instance the common transactions in dealing with a pool of assets: selecting investments, exchanging one instrument or asset for another, and so on. 'Settlor' functions, in contrast, include conduct such as establishing,

30

funding, amending, or terminating a plan." *Id.* (internal quotation marks and citations omitted). Therefore, to the extent that Honeywell decided to terminate Plaintiffs' medical coverage benefits, it was acting as a "settlor" rather than a "fiduciary" and is not subject to liability under ERISA on these grounds.

That being said, the scope of ERISA fiduciary duties also includes "a duty to avoid intentional material misrepresentations in plan administrators' communications with plan beneficiaries about the contents of a plan." *Bell*, 626 F.3d at 74; *see Devlin*, 274 F.3d at 88 ("[A] fiduciary also has a 'duty to deal fairly and honestly with its beneficiaries.'") (internal citations omitted). A plan administrator that "affirmatively misrepresents the terms of a plan or fails to provide information when it knows that its failure to do so might cause harm . . . has breached its fiduciary duty to individual plan participants and beneficiaries." *Abbruscato*, 274 F.3d at 103 (quoting *In re Unisys Corp. Retiree Med. Benefit "ERISA" Litig.*, 57 F.3d 1255, 1264 (3d Cir. 1995)).   In other words, "while the consideration of plan changes and the decision itself may not be subject to fiduciary duties, communicating to employees about those potential changes is a discretionary act of plan management and administration that falls within the statutory definition of 'fiduciary' acts." *Hudson v. Gen. Dynamics Corp.*, 118 F. Supp. 2d 226 (D. Conn. 2000) (citing *Varity Corp. v. Howe*, 516 U.S. 489, 502 (1996)).   A plaintiff "assert[ing] a breach of fiduciary duty claim based on a material misrepresentation or omission . . . must establish detrimental reliance." *Bell*, 626 F.3d at 75.  To

establish detrimental reliance means "there must be a substantial likelihood that the misrepresentation would mislead a reasonable employee in making an adequately informed decision about if and when to retire." *Id.*

The Court finds the breach of fiduciary duty claim moot as to Plaintiffs who retired before the agreements expired, because summary judgment in their favor on Counts I and II remedies the harm suffered.  It is possible that Plaintiffs who retired *after* the expiration of the contract detrimentally relied on the employer's promise if they would have had vested rights to lifetime medical coverage benefits.   For example, evidence shows that some employees were eligible for early retirement.  [*See, e.g.,* Dkt. 44-4 (Pls.' Mot. Summ. J. LRS1, Norko Retirement Benefit Letter, October 8, 1998), at HON_00004661; Dkt. 44-5 (Pls.' Mot. Summ. J. LRS2, Dellolio Retirement Benefit Letter, June 16, 1997), at HON_00004694].   If AlliedSignal had represented to employees that they would not be entitled to lifetime medical coverage if they retired after the expiration of the EBA, it is conceivable that many eligible employees would have retired prior to the contract expiration.

The Court notes a few examples of how a plaintiff could have detrimentally relied on a promise of lifetime medical coverage benefits.  As mentioned above, a 1994 union report about recently bargained-for benefits contained language as follows: "[The EBA] breaks new ground in many areas, especially with its lifetime guarantees of protection for retiree pensions and medical coverage."  [Dkt. 44-10 (Kelly Dep.), at 133:10-22; *see* Dkt. 24-10, at 1].  Kelly testified Local 1010 members received this handbook

at the ratification meeting and it was approved by George Metzger and Frank McNally of Textron, who relayed the information to AlliedSignal. [*See* Dkt. 44-10, at 77:23-78:24].    It is possible members could have detrimentally relied on this document.  Another example is Richard Norko's testimony that in 1998 he met with Mary Ann Palmiero, "who was working in benefits," and Palmiero indicated "that [he] and [his] wife would be covered for life in [their] medical benefits amongst other things which were how much money [he] would make in [his] retirement, . . . what [he] would get, what [he] was entitled to. . . ." [Dkt. 44-18 (Norko Dep.), at 17:10:18].    Evidence does not demonstrate whether such retirement meetings were held for all class members prior to the Agreements' expirations or, alternatively, prior to the employees' retirements.

Without determining at what point the employee obtained the vested right to lifetime full medical coverage, the Court cannot yet address the breach of fiduciary duty claim as it may be moot after the hearing. Notwithstanding, the Court finds there is a triable issue of fact as to whether Honeywell breached its fiduciary duty by leading employees who retired after the expiration of the Agreements to believe they were entitled to lifetime medical coverage benefits.

## V.    CONCLUSION

For the foregoing reasons, the Court GRANTS Summary Judgment as to Counts I and II in favor of the Plaintiffs who retired before expiration of the

Agreements.  The Court DENIES Plaintiffs' Motion for Summary Judgment as to Counts I and II for the subclass of Plaintiffs who retired after expiration of the Agreements.  The Court finds Count III is moot as to Plaintiffs who retired before expiration of the Agreements and DENIES Defendant's Motion for Summary Judgment as to Count III for the subclass of Plaintiffs who retired after expiration of the Agreements.  The Court will hold a hearing on damages after determining the scope of Plaintiffs whose rights are contractually vested.

                    IT IS SO ORDERED.


                    _____/s/_____
                    Hon. Vanessa L. Bryant
                    United States District Judge


Dated at Hartford, Connecticut:  February 8, 2017